*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 09a0363p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

UNITED STATES OF AMERICA,
>>> *Plaintiff-Appellee,*

>>> *v.*

No. 08-5372

WILBUR B. ADAMS, JR.,
>>> *Defendant-Appellant.*

———————————

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 06-00181-001—Todd J. Campbell, Chief District Judge.

Argued: June 18, 2009

Decided and Filed: October 14, 2009

Before: KEITH, CLAY, and GIBBONS, Circuit Judges.

———————————

**COUNSEL**

**ARGUED:** Isaiah S. Gant, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Nashville, Tennessee, for Appellant. Blanche Bong Cook, ASSISTANT UNITED STATES ATTORNEY, Nashville, Tennessee, for Appellee. **ON BRIEF:** Isaiah S. Gant, Michael C. Holley, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Nashville, Tennessee, for Appellant. Jimmie Lynn Ramsaur, ASSISTANT UNITED STATES ATTORNEY, Nashville, Tennessee, for Appellee.

KEITH, J., delivered the opinion of the court, in which CLAY, J., joined. GIBBONS, J. (p. 19), delivered a separate concurring opinion.

———————————

**OPINION**

———————————

DAMON J. KEITH, Circuit Judge. Following a jury trial, Defendant-Appellant Wilbur Adams, Jr. ("Adams") was convicted of being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924. On appeal, Adams argues that the district court

erred by: (1) failing to suppress the firearm at issue because it was discovered pursuant to an unconstitutional search of his jacket; (2) concluding that Adams validly waived his *Miranda* rights and therefore failing to suppress Adams's inculpatory statements to the police; and (3) failing to instruct the jury that Adams's confession must be corroborated by independent evidence, in light of this Court's opinion in *United States v. Marshall*, 863 F.2d 1285 (6th Cir. 1988). For the reasons set forth below, we affirm the district court's decision denying Adams's motion to suppress the firearm and his statement to the police, but reverse the court's denial of the proposed jury instruction and remand for a new trial.

## I.     BACKGROUND

### A.     Factual Background

At approximately 1:30 a.m. on May 15, 2006, Adams and a group of seven to ten individuals gathered in Room 241 of the Travelodge Motel, in Nashville, Tennessee.[1] Room 241 was registered solely to Dwight Bond ("Bond"),[2] who rented the room on a weekly basis between March 3 and June 2, 2006. According to the record, Room 241 was a small, ordinary motel room with a dresser, table, two beds, a television, and a bathroom at the far end of the room. At the time of the May 15 gathering, Sergeant Michael Eby ("Sergeant Eby") of the Nashville Metropolitan Police Department was patrolling the immediate area around the motel. From his patrol car, Sergeant Eby noticed a significant amount of "pedestrian" traffic going in and out of Room 241, prompting his suspicion and further observation. After approximately ten minutes of observation, Sergeant Eby determined the activity in Room 241 warranted investigation, and called for assistance from other officers in the area, including Officer Matthew Valiquette ("Officer Valiquette"), to conduct a "knock and talk"[3] at Room 241.

---

[1] According to at least one guest, the gathering was in celebration of Adams's birthday.

[2] Throughout the record, witnesses refer to Dwight Bond by several different names, including Boyd, Bond, Michael, Dwight, and Eddie.

[3] Sergeant Eby described the "knock and talk" as an investigative procedure, whereby, upon noticing "some kind of activity," police "knock on the door and talk to the occupants there."

Around the same time that Officer Valiquette arrived on the scene, Jermaine Lymon ("Lymon") and another guest of Room 241 noticed the police cars gathering in the motel parking lot and informed the other individuals in the room that the police were outside. A few moments later, Sergeant Eby and Officer Valiquette knocked on the door of Room 241 and, at Bond's instruction, someone (other than Bond or Adams) opened the door for the police. Upon inquiry by the officers, Bond promptly identified himself as the registered guest of the room.

At the request of Sergeant Eby, Bond stepped outside of the motel room onto the balcony in front of the motel room door to briefly speak with Sergeant Eby and Officer Valiquette. According to Officer Valiquette, when the door to Room 241 opened, from their vantage point on the balcony the officers "had visible signs of drug activity" strewn around the room, such as "torn up baggies," and "chore boys," which Valiquette described as a "goldish Brillo pad commonly used to stick down into a crack pipe and used to facilitate smoking crack cocaine." The officers told Bond that they had observed "a lot of traffic in and out of the location," and asked him "if he had any sort of contraband in his room." Bond responded that he did not have any contraband in the room, and gave the officers his consent to look around the room for contraband.[4]

Once Bond gave his consent for the officers to search the room for contraband, Officer Valiquette stood watch over the guests – most of whom were seated on either of the two beds in the room – while Sergeant Eby walked directly to the bathroom and began searching the room from back to front. Adams, along with a few other guests, was sitting on the bed that was farthest from the front door and next to the bathroom wall. According to Lymon, there were clothes scattered throughout the room – hanging up and lying on the bathroom floor, on the floor next to the television, and piled on top, and inside, of a suitcase sitting on the floor next to the television – and Sergeant Eby began looking through the clothes as he conducted his search of the room.

---

[4]Although there was conflicting testimony given at the evidentiary hearing as to whether Valiquette asked for permission to search for "contraband" specifically, the district court credited the officers' testimony on this issue.

As Sergeant Eby was returning from the bathroom to the front of the motel room, he saw Adams's jacket lying on the floor in a "little gap" between the second bed and the wall next to the bathroom. According to the district court, Sergeant Eby saw the jacket on the floor, picked it up, and asked who owned the jacket, and no one responded.[5] After picking up the jacket, Sergeant Eby noticed that it was unusually heavy, proceeded to look in the inside pocket of the jacket and found the gun at issue, along with a crack pipe and some crack cocaine.

Following Sergeant Eby's search of the jacket and subsequent discovery of the gun, the police officers handcuffed several of the guests and proceeded to remove them from Room 241 to the balcony outside the room in order to question them individually. As a result of the questioning, the police officers ultimately narrowed down the suspected owner of the jacket to two individuals: Adams and Lymon.[6] At that time, Officer Valiquette handcuffed Adams while still in the motel room, read Adams his *Miranda* rights and asked if he understood them – to which Adams responded, "I do." Up to this point, Adams maintained that it was not his jacket or gun.

Officer Valiquette eventually transported Adams to his patrol car in the motel parking lot and continued his interrogation. At approximately 4:15 a.m., almost three hours after Adams's arrest, and after Officer Valiquette told Adams (falsely) that Valiquette had seen footage on a motel security video of Adams wearing the jacket,

---

[5]Adams contends that the district court erred in failing to state its factual determinations regarding whether Sergeant Eby inquired as to the ownership of the jacket *before* reaching into the inside pocket of the jacket and finding the gun and drug contraband, or *after* he had already searched the jacket and found the gun. However, his contention is belied by the record. The district court analyzed Sergeant Eby's actions under three possible scenarios: (1) Sergeant Eby lifted the jacket off the floor consistent with his consent to search for contraband, asked who owned the jacket and no one claimed it, determined it was unusually heavy, consistent with the weight of a gun, and looked inside the jacket and found the gun; (2) Sergeant Eby asked who owned the jacket, and no one responded. He then proceeded to pick the jacket up off the floor, noticed and commented that it was unusually heavy, looked in the inside pocket of the jacket and found the gun at issue, along with a crack pipe and some crack cocaine; *or* (3) Sergeant Eby picked up the jacket from the floor, noticed that it was heavy, looked in the inside pocket and found the gun, along with a crack pipe and some crack cocaine, and then asked who owned the jacket, to which no one responded (SuppTr., Vol. II at 225-27). The court then found that under any of the scenarios the jacket was not claimed and "had been abandoned for purposes of privacy interest." (SuppTr., Vol. II at 224-28). But the court indeed stated its ultimate finding consistent with the first scenario.

[6]During the questioning, everyone that was in the room told the police that the jacket belonged to Adams, except Dickerson, who claimed the jacket belonged to Lymon, and Adams. Ultimately, however, Adams admitted ownership of the jacket.

Adams confessed to possessing the gun.  Upon procuring Adams's confession, Officer Valiquette completed a "Gun Questionnaire Form" ("Questionnaire"), indicating that Adams admitted the gun belonged to him.  Officer Valiquette did not have Adams sign one of the written *Miranda* waiver forms he had in his patrol car at the time because "he just didn't think about it."

At the top of the Questionnaire was the word "MIRANDA" followed by two adjacent, separate boxes captioned "yes" and "no," with the box next to "yes" checked off by Officer Valiquette.    Directly under the word "MIRANDA" was the word "WAIVER," also followed by two adjacent, separate boxes, captioned "yes" and "no," neither of which was checked.  *Id.*  According to Valiquette, the "yes" box checked next to the word "MIRANDA" indicated that Valiguette had read Adams his *Miranda* rights, and the boxes next to "WAIVER" were unchecked because it was Valiquette's understanding that the "WAIVER" boxes referenced express, written waivers only. Thus, because Valiquette did not have Adams sign a written waiver and because there was no express waiver, i.e., Adams "never said I am waiving [my] rights," Valiquette deemed the boxes inapplicable. Valiquette testified, however, that although Adams never expressly waived his *Miranda* rights, he kept talking to Valiquette, and "he never asked for an attorney . . . never said he didn't want to answer any questions or anything like that."

## B.      **Procedural History**

On October 4, 2006, Adams was indicted on charges of being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924.  On August 10, 2007, Adams moved to suppress both the underlying firearm and the inculpatory statement he made to Valiquette subsequent to his arrest.  On September 18, 2007, following a two-day evidentiary hearing on the suppression issues, the district court issued a bench order denying Adams's motion to suppress both the physical evidence, as well as Adams's subsequent statement to the police.  The court concluded that Sergeant Eby's search of the jacket did not violate Adams's constitutional rights, as "[the jacket] had been abandoned for purposes of privacy interest," and "the officer was

entitled to determine for officer safety why it was heavy since there is a natural possibility that a weapon might be in the jacket."   The court further concluded that Adams "knowingly, intelligently and voluntarily waived [his *Miranda*] rights through indicating that he understood them and by talking to the officer."

On December 3, 2007 – the eve of trial – Adams asked the court to give the jury the following instruction:

> Evidence has been presented that the Defendant, Wilbur B. Adams, Jr., admitted that he possessed the firearm as described in the Indictment. You may not convict Wilbur B. Adams, Jr. solely upon his own uncorroborated statement or admission.

ROA at 82.  The court denied Adams's request, concluding that "the gun is sufficient corroborating evidence to make this instruction inapplicable."

At Adams's trial, held on December 4 and 5, 2007, in addition to Adams's confession, the government presented the testimony of Sergeant Eby and Officer Valiquette, along with the gun, crack cocaine, and pipe that was found in the jacket.  No other physical or testimonial evidence was presented.  The jury found Adams guilty of the firearm possession charge, and on March 10, 2008, the district court sentenced Adams to 120 months of imprisonment and two years of supervised release.

## II.     ANALYSIS

Adams asserts three arguments on appeal:  (1) the search of his jacket violated his Fourth Amendment rights; (2) the government failed to meet its burden of proving that Adams knowingly and voluntarily waived his *Miranda* rights; and (3) the court's refusal to give the jury the confession/corroboration instruction was erroneous.  We address each in turn.

### A.     Motion to Suppress

When reviewing a district court's decision on a motion to suppress, this Court reviews the district court's factual findings for clear error, and its legal conclusions *de novo*.  *United States v. Gillis*, 358 F.3d 386, 390 (6th Cir. 2004).  "A factual finding will

only be clearly erroneous when, although there may be evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Navarro-Camacho*, 186 F.3d 701, 705 (6th Cir. 1999). When a district court has denied a motion to suppress, this Court reviews the evidence "in the light most likely to support the district court's decision." *Id.* (quoting *United States v. Braggs*, 23 F.3d 1047, 1049 (6th Cir. 1994), *cert. denied*, 513 U.S. 907 (1994)).

### 1. Search of Adams's Jacket

The Fourth Amendment provides, in relevant part, that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. This Court has recognized that "[b]ecause Fourth Amendment rights are 'personal,' . . . the central inquiry in any suppression hearing is whether the defendant challenging the admission of evidence has shown a legitimate expectation of privacy in the place searched or the thing seized." *United States v. King*, 227 F.3d 732, 743 (6th Cir. 2000) (citing *Rakas v. Illinois*, 439 U.S. 128, 140 (1978)). Whether a legitimate expectation of privacy exists in a particular place or thing is determined on a "case-by-case basis." *King*, 227 F.3d at 744. In determining whether a legitimate expectation of privacy exists, we employ a two-part inquiry. "'First, we ask whether the individual, by [his] conduct, has exhibited an actual expectation of privacy; that is, whether he has shown that he sought to preserve something as private . . . . Second, we inquire whether the individual's expectation of privacy is one that society is prepared to recognize as reasonable.'" *United States v. Waller*, 426 F.3d 838, 844 (6th Cir. 2005) (citing *King*, 227 F.3d at 742 (quoting *Bond v. United States*, 529 U.S. 334, 338 (2000))).

The Fourth Amendment prohibits the warrantless search of a hotel unless it falls within an exception to the warrant requirement, such as consent. *See United States v. Caldwell*, 518 F.3d 426, 429 (6th Cir. 2008). Here, it is not disputed that Bond, as the renter of Room 241, had a legitimate privacy interest in the room and, thus, the authority to give consent to the officers to search the room for contraband. It is also undisputed

that he gave such consent.[7]     Accordingly, Adams does not contend that his Fourth Amendment rights were violated by the search of the motel room.  Instead, he contests the scope of Bond's consent and whether it extended to the inside pocket of Adams's jacket where the gun was found.  Adams argues that his Fourth Amendment rights were violated when Sergeant Eby searched the interior pocket of his jacket, which was "kind of hidden" in the "little gap" between a bed and a wall.  Thus, the question is:  whether under the facts of this case, Adams – by his conduct – retained a sufficient expectation of privacy in the jacket, such that Sergeant Eby violated Adams's rights under the Fourth Amendment when he picked up the jacket, and when he searched the inside pocket.  *See United States v. Ross*, 456 U.S. 798, 822-23 (1982) (noting that Fourth Amendment protection varies depending on the factual circumstances in each situation).  We find that he did not.

The district court concluded that Sergeant Eby's search of the motel room fell within the consent exception to the warrant requirement.  Moreover, the court concluded that Bond's consent to search the motel room for contraband "included consent to look throughout the room in places where contraband could possibly be located[, a]nd that picking the jacket up off the floor was within the scope of that consent." (SuppTr., Vol. II at 227.)  The court further found that once the jacket was picked up "Officer Eby asked whose jacket it was and nobody claimed it."  Thus, the court determined that "there was no assertion of privacy in the jacket[, a]nd any privacy interest was effectively abandoned at the time under either version of the facts about when the gun was discovered in the jacket."  Once Sergeant Eby picked up the jacket and determined that it was heavy, the court concluded that Eby "was entitled to determine for officer safety why it was heavy since there is a natural possibility that a weapon might be in the jacket."

---

[7]As previously stated, noting conflicting testimony as to whether Bond consented to a search of the room for contraband specifically, the district court credited the testimony of the officers.  Because the district court was in the best position to assess credibility, we defer to the court's determination on this issue. *See United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999).

Adams argues that the district court erred in its determination that the consent given by Bond to search the motel room for contraband sufficiently authorized the officers to search the jacket in which the gun was found. Specifically, Adams contends that the handgun found in the pocket of his jacket should have been suppressed because: (1) Bond's consent to search the motel room did not authorize the search of Adams's jacket; (2) Sergeant Eby's search of the inside pocket of the jacket violated Adams's legitimate expectation of privacy; and (3) even if Sergeant Eby legitimately developed probable cause to believe Adams's jacket contained a gun once he picked it up, Eby was required to seize the jacket pending application for a warrant.

Here, Adams's jacket was lying on the floor of the motel room, away from him, but in the sight of Sergeant Eby,[8] who had Bond's consent to search the room for contraband. There were clothes strewn about the floor and throughout various parts of the room, and the officers had observed drug contraband on the floor from their vantage point in the doorway of the room prior to the consented search. In addition, at least one of the other guests of the room testified that, in conducting his search for contraband, Sergeant Eby was "going through" the clothes scattered on the floor throughout the room. Because, under these circumstances, it was not unreasonable for Sergeant Eby to pick up the jacket from the floor in search of drug contraband, we find that the district court did not clearly err in its determination that the scope of Bond's consent to search the room for contraband included lifting the jacket off of the floor.

But the inquiry does not end there. In its suppression ruling, the district court properly recognized that Bond's consent to search the motel room "does [not] necessarily include everything in it[, a]nd that guests to a motel room still may have a privacy interest in things they brought with them, depending on the totality of the circumstances." (SuppTr., Vol. II at 226.) *See, e.g.*, *Waller*, F.3d at 845 (noting that a resident's consent to search his premises does not necessarily establish authority to search a guest's closed container on the premises). The court noted, however, that based

---

[8]Although Adams argues that he "stuck" his jacket in the gap between the bed and the wall, at no point does he contend that the jacket was completely out of view from Sergeant Eby during his search of the room, nor does the record support such a contention.

on the totality of the circumstances in the instant case, Adams, by his conduct, had abandoned any privacy interest he may have had in the jacket by the time Sergeant Eby picked it up, suspected – based on the heaviness of the jacket – that there was a gun inside, and searched the inside pocket. We agree.

It is undisputed that the jacket was visibly lying on the floor in a space between the bed on which Adams and several other guests were seated, and the wall. Adams was not wearing the jacket, was not holding the jacket, did not have the jacket within his immediate reach, and did not otherwise indicate by his actions that he had any privacy interest in the jacket. In fact, once Sergeant Eby properly lifted the jacket from the floor, and asked to whom the jacket belonged, no one – including Adams – claimed ownership of the jacket. Based on these circumstances, we find that the district court did not clearly err in its determination that Adams did not have a legitimate expectation of privacy in the jacket at the time Sergeant Eby conducted his search.

Adams argues that even if Sergeant Eby's act lifting the jacket up off the floor was proper and within the scope of his search pursuant to Bond's consent, once Eby developed probable cause to believe that there was a gun inside of the jacket, pursuant to *United States v. Chadwick*, 433 U.S. 1 (1977), he was "required . . . to get [a] warrant before exploring the jacket's content." Appellant's Br. at 38-39. Adams's reliance on *Chadwick* is misplaced. First, *Chadwick* is materially distinguishable from the instant case in that the issue there involved the search of a footlocker, *i.e.*, a closed container, in an automobile. And second, even if the facts of *Chadwick* were comparable, the law regarding search and seizure of closed containers has evolved since *Chadwick* was decided. *See, e.g.*, *California v. Acevedo*, 500 U.S. 565 (1991) (clarifying the approach to be taken by police officers confronted with a closed container in an automobile, concluding that the Fourth Amendment does not prohibit a warrantless "search [of] an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained."). *Id.* at 580. Thus, we find Adams's argument on this issue unpersausive.

The district court correctly found that, under the circumstances here, once Sergeant Eby properly lifted the jacket off of the floor – which "had been abandoned for purposes of privacy interest" – and determined that it was unusually heavy, "officer safety" justified an exception to the warrant requirement to search the inside of the jacket. In addition to consent, the existence of exigent circumstances provides a relevant exception to the warrant requirement. *See Mincey v. Arizona*, 437 U.S. 385, 392-93 (1978) ("the need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency") (quoting *Wayne v. United States*, 318 F.2d 205, 212 (D.C. Cir. 1963)). We have recognized four general categories that satisfy the exigent circumstances exception: "(1) hot pursuit of a fleeing felon; (2) imminent destruction of evidence; (3) the need to prevent a suspect's escape, and (4) a risk of danger to the police or others." *United States v. Rohrig*, 98 F.3d 1506, 1515 (6th Cir. 1996). We have noted, however, that "[q]ualification for this exception is not easy." *United States v. Purcell*, 526 F.3d 953, 960 (6th Cir. 2008) (citing *United States v. Chambers*, 395 F.3d 563, 565 (6th Cir. 2005)).

For example, in *United States v. Johnson*, 22 F.3d 674 (6th Cir. 1994), we concluded that no exigent circumstances existed to justify the warrantless search and seizure of guns from defendant's closet, based on information obtained from defendant's freed kidnap victim. *See Johnson*, 22 F.3d at 680 ("The mere presence of firearms does not create exigent circumstances."). In *Johnson*, even though the police officers had reason to believe there were firearms on the premises based on the information they received from the kidnap victim, once the victim was freed, and defendant was not on the premises, the police had sufficient time to secure a search warrant. *Id.*

The circumstances in the instant case are quite distinguishable from *Johnson*. Here, Sergeant Eby and other police officers were in the midst of properly conducting a search for drug contraband. Based on Sergeant Eby's training and experience, he recognized that the additional weight of the jacket was consistent with the weight of a handgun. By all accounts, room 241 was a small motel room, and as Eby was conducting his search, there were several guests situated throughout various parts of the

room, including between Sergeant Eby and the door.  And, according to the officers' testimony, drug contraband had already been uncovered.  Moreover, the officers were familiar with the immediate area surrounding the motel, and knew it to be a high-crime area.  Considering the totality of these circumstances, the district court did not clearly err in determining that officer safety satisfied the exigent circumstances exception to the warrant requirement.  Accordingly, the district court did not err in denying Adams's motion to suppress the firearm found in the pocket of his jacket.

## 2.  Adams's Confession

Next, Adams argues that the inculpatory statements he made to Officer Valiquette after his arrest should be suppressed under *Miranda v. Arizona*, 384 U.S. 436 (1966), "unless the Government meets its 'great' burden of proving that Adams waived his *Miranda* rights and that the waiver was knowing and voluntary."  Appellant's Br. at 58.  The government maintains that Adams waived his *Miranda* rights by voluntarily speaking with Officer Valiquette after Valiquette read him his *Miranda* rights, and Adams affirmed that he understood those rights, did not ask for an attorney, and continued talking to Valiquette.

It is the government's burden to establish a waiver by a preponderance of the evidence.  *See United States v. Nichols*, 512 F.3d 789, 798 (6th Cir. 2008).  The application of the *Miranda* rule is limited to "custodial interrogations," i.e., "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in a significant way."  *United States v. Salvo*, 133 F.3d 943, 948 (6th Cir. 1998) (quoting *Miranda*, 384 U.S. at 444).  "Thus, in order for *Miranda* to apply, the suspect must either be actually taken into custody or the restraint on his freedom must rise to the level associated with a formal arrest."  *Salvo*, 133 F.3d at 948 (citing *California v. Beheler*, 463 U.S. 1121, 1125 (1983)).  A waiver of *Miranda* rights must be voluntary, that is, "the product of a free and deliberate choice rather than intimidation, coercion or deception."  *Machacek v. Hofbauer*, 213 F.3d 947, 954 (6th Cir. 2000) (citing *Moran v. Burbine*, 475 U.S. 412, 421 (1986) (quoting *Fare v. Michael C.*, 442 U.S. 707, 725 (1979))).

"The waiver must have been made with full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the investigation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Id.* In accessing whether a waiver is knowing and intelligent, "the relevant question is not whether the 'criminal suspect [knew] and [understood] every possible consequence of a waiver of the Fifth Amendment privilege,' but rather whether the 'suspect [knew] that he [could] choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking any time." *Garner v. Mitchell*, 557 F.3d 257, 261 (6th Cir. 2009) (quoting *Colorado v. Spring*, 479 U.S. 564, 573-74 (1987)).

This Court has held that a *Miranda* "waiver may be clearly inferred . . . when a defendant, after being properly informed of his rights and indicating that he understands them, nevertheless does nothing to invoke those rights" and speaks. *Nichols*, 512 F.3d at 798-99. Thus, a waiver of *Miranda* rights need not be made in writing, and need not be expressly made. *United States v. Miggins*, 302 F.3d 384, 397 (6th Cir. 2002). Rather, courts may infer an implied waiver "from the actions or words of the person interrogated." *North Carolina v. Butler*, 441 U.S. 369, 373-76 (1979).

In the instant case, there was no written waiver of *Miranda* rights executed by Adams. That fact, however, is not determinative, as the record clearly reflects by a preponderance of the evidence that Adams knowingly and voluntarily waived his *Miranda* rights. Officer Valiquette read Adams his *Miranda* rights after Adams was handcuffed, and asked if he understood those rights; Adams verbally responded, "I do." There is no indication in the record that Adams ever asked for a lawyer, nor does Adams assert that he made such a request. After verbally acknowledging that he understood his *Miranda* rights, Adams continued talking with Officer Valiquette, albeit first denying ownership of the jacket and gun at issue. However, Adams subsequently made incriminating statements, admitting the gun was his and that he carried it for protection. Furthermore, Adams proceeded to answer a series of questions from the Questionnaire

regarding his possession and ownership of the gun.     Adams then signed the Questionnaire, and placed his fingerprint on it.

Adams's challenge to the waiver of his *Miranda* rights appears to be based largely on the fact that the "WAIVER" box on the Questionnaire was unchecked by Valiquette, and Valiquette's evidentiary hearing testimony that the box remained unchecked because Adams "never did waive his rights."   Valiquette testified, however, that although Adams never expressly waived his *Miranda* rights, "he never asked for an attorney . . . never said he didn't want to answer any questions or anything like that." Valiquette further explained that he did not check the "WAIVER" box because it was his understanding that it referred to whether a written waiver was executed. Thus, notwithstanding the ambiguity of the Questionnaire, the record supports the district court's determination that "based on the totality of the circumstances, Adams was read his *Miranda* rights[,] . . . he understood them and [he] knowingly, intelligently and voluntarily waived those rights through indicating that he understood them and by talking to the officer."   Accordingly, we find that the district court did not clearly err in denying Adams's motion to suppress his confession.

**B.     Jury instruction**

Finally, Adams challenges the district court's refusal to instruct the jury that it could not find Adams guilty solely on the basis of his uncorroborated confession. Adams asked the district court to give the jury the following instruction regarding reliance on an uncorroborated confession:

> Evidence has been presented that the Defendant, Wilbur B. Adams, Jr., admitted that he possessed the firearm as described in the Indictment. You may not convict Wilbur B. Adams, Jr. solely upon his own uncorroborated statement or admission.

ROA at 82.  The district court denied Adams's request on the proposed jury instruction, stating that "[i]ndependent corroborating evidence is only required in cases where there is no clear proof of the *corpus delecti*, and here the *corpus delecti* or body of the crime

is the gun.  And on that basis, [the court is] declining to [allow the proposed jury instruction]."  The court gave the following instruction regarding Adams's statement:

> You have received evidence of an alleged statement by the defendant to certain law enforcement officers. You must decide whether the defendant did in fact make the statement. If you find that the defendant did make the statement, then you must decide what weight, if any, you feel the statement deserves. In making this decision, you should consider all matters in evidence having to do with the statement, including those concerning the defendant himself and the totality of the circumstances under which the statement was allegedly made.

(TTr., Vol. II at 388.)

When reviewing a district court's decision to deny a specific jury instruction request, this Court applies an abuse of discretion standard.  *See United States v. Jones*, 403 F.3d 817, 821 (6th Cir. 2005).  We "review jury instructions as a whole to determine if they adequately inform the jury of the relevant considerations and provide a basis in law for aiding the jury in reaching its decision and will reverse a jury verdict on account of an instructional error only in situations where the instruction, viewed as a whole[,] is confusing, misleading, and prejudicial."  *United States v. Blackwell*, 459 F.3d 739, 764 (6th Cir. 2006) (quoting *Romanski v. Detroit Entm't, LLC*, 428 F.3d 629, 641 (6th Cir. 2005)).  "A refusal to give requested instructions is reversible error only if (1) the instructions are correct statements of the law; (2) the instructions are not substantially covered by other delivered charges; and [(3)] the failure to give the instruction impairs the defendant's theory of the case."  *United States v. Hargrove*, 416 F.3d 486, 489 (6th Cir. 2005) (quoting *United States v. Newcomb*, 6 F.3d 1129, 1132 (6th Cir. 1993)).  This Court "will not reverse a decision on the basis of an erroneous jury instruction where the error is harmless."  *Barnes v. Owens-Corning Fiberglas Corp.*, 201 F.3d 815, 822 (6th Cir. 2000).

Adams's proposed jury instruction is rooted in this Court's decision in *United States v. Marshall*, 863 F.2d 1285 (6th Cir. 1988).  In *Marshall*, the defendant was charged with cocaine distribution, based solely on his taped admissions to a government informant, who sought to sell cocaine to the defendant, that "some of his friends were

interested in buying drugs." *Id.* at 1286. On appeal, Marshall argued the district court erred in failing to instruct the jury that it could not find him guilty of the drug offense based solely on his uncorroborated admissions. *Id.* We noted, in reversing Marshall's conviction on the drug offense, that "[t]his Circuit has long followed the principle enunciated in *Opper* and *Smith*, that a defendant's extrajudicial, post-offense statements must be corroborated with independent evidence in order to assure reliability and truthfulness." *Marshall*, 863 F.2d at 1287 (referencing the Supreme Court's decisions in *Opper v. United States*, 348 U.S. 84 (1954) (holding that post-arrest admissions and confessions require corroboration of the essential facts admitted by a defendant), and *Smith v. United States*, 348 U.S. 147 (1954) (noting that the purpose of requiring corroboration of such statements is to prevent errors in convictions based upon untrue confessions alone)).

Here, the government contends that the district court properly rejected Adams's proposed jury instruction because, in addition to Adams's confession, other evidence presented at trial – namely, the fact that the gun was found near Adams, and the officers' testimony that after securing the gun they began interviewing everyone individually, which enabled them to narrow down the suspects and establish ownership of the gun – "clearly established the body of the crime, the *corpus delecti*," thereby fulfilling the corroboration requirement. Thus, the government contends that Adams's confession was corroborated by the gun being found.

The government's argument, however, fails in light of established law in this Circuit. Under binding precedent in this Circuit, the instruction is required notwithstanding the existence of additional corroborating evidence. *Marshall*, 863 F.2d at 1288 (holding that the district court's refusal to give the requested corroboration instruction was erroneous where "[t]he record reveals some evidence which may tend to corroborate defendant's statements that he distributed cocaine, but the jury was never advised that corroboration was necessary"). Moreover, the fact that the gun was found in a jacket, without more, does not establish a violation of 18 U.S.C. § 922(g)(1). *See id.* (requiring possession of a gun by a convicted felon). And, the only other evidence

the government introduced regarding gun possession in the instant case was the testimony of the officers that the gun was found in a jacket and that Adams ultimately admitted possession of the weapon. Thus, in addition to its failure to give the requested jury instruction concerning corroboration as required under *Marshall*, the district court's determination that the mere presence of the gun provided the *corpus delecti*, i.e., proof that the crime was committed, independent of Adams's admission, is unsupported by the record.

Further, the government's reliance on *United States v. Harris*, No. 93-5706, 1994 WL 47806 (6th Cir. Feb. 15, 1994),[9] and *United States v. Howard*, 179 F.3d 539 (7th Cir. 1999), is equally unavailing in light of this court's decision in *Marshall*. *See Darrah v. City of Oak Park*, 255 F.3d 301, 309 (6th Cir. 2001) ("The prior decision [of a Sixth Circuit panel] remains controlling authority unless an inconsistent decision of the United States Supreme Court requires modification of the decision or this Court sitting en banc overrules the prior decision.") (citation omitted). We find that the district court erred in its refusal to give the jury instruction, as it correctly stated the law in this Circuit regarding corroboration of Adams's post-arrest confession and the delivered instructions did not substantially cover the requested instruction.

Moreover, the record indicates that here, as in *Marshall*, the court's failure to advise the jury that corroboration was necessary substantially impaired Adams's defense. During closing arguments to the jury, the government stated, "this is the gun that was in the jacket in that room at the Travelodge Motel. This is the same gun that the defendant admitted was his. He admitted it in writing on that Gun Questionnaire. That's what you need to know about this case." Defense counsel, in his closing, noted the government's repeated reference to Adams's confession, and attempted to emphasize to the jury that the government had the burden of proving Adams's guilt beyond a reasonable doubt, and that Adams could not be convicted by his own words. Nevertheless, because the jury was never advised that corroboration of Adams's

---

[9]In addition, *Harris* is distinguishable from both *Marshall* as well as the instant case because in *Harris*, the Court determined that in addition to defendants confession, there was independent evidence of criminal activity. *See Harris*, 1994 WL 47806, at *4.

confession was required, it may have improperly convicted on the basis of the uncorroborated statement alone. *Marshall*, 863 F.2d at 1288.  It cannot be said that the district court's error in refusing to give the proposed instruction was harmless.  Thus, we find that the district court abused its discretion by refusing to deliver the jury instruction.

**III.  CONCLUSION**

For the foregoing reasons, we affirm the district court's decision denying Adams's motion to suppress the firearm and his statement to the police, but reverse the court's determination denying the proposed jury instruction and remand for a new trial.

———————————————

**CONCURRENCE**

———————————————

JULIA SMITH GIBBONS, Circuit Judge, concurring. I concur in Judge Keith's opinion and write separately to note one point about the suppression issue. In my view, the search here was clearly justified by the presence of the exigent circumstance of insuring officer safety. While I do not disagree with Judge Keith's analysis of the abandonment issue, I emphasize that the search was reasonable even if Adams had not abandoned his jacket. The two bases for upholding the search are independent, and the exigent circumstances basis seems the more obvious of the two to me.