[Cite as *State v. Leet*, 2012-Ohio-6186.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

STATE OF OHIO                                    :

      Plaintiff-Appellee                     :          C.A. CASE NO.    24692

v.                                               :          T.C. NO.    10CR635

GREGORY LEET                                     :             (Criminal appeal from
                                                      Common Pleas Court)

      Defendant-Appellant                    :

                                                          :

. . . . . . . . . .

# **O P I N I O N**

Rendered on the ___28th___ day of ___December___, 2012.

. . . . . . . . . .

R. LYNN NOTHSTINE, Atty. Reg. No. 0061560, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
      Attorney for Plaintiff-Appellee

MARSHALL G. LACHMAN, Atty. Reg. No. 0076791, 75 North Pioneer Blvd., Springboro, Ohio 45066
      Attorney for Defendant-Appellant

. . . . . . . . . .

DONOVAN, J.

    **{¶ 1}**   Defendant-appellant Gregory Leet appeals his conviction and sentence for

the following offenses: Count I, murder (purposeful), in violation of R.C. 2903.02(A), an unclassified felony; Count II, murder (purposeful), in violation of R.C. 2903.02(A), an unclassified felony; Count III, murder (proximate result), in violation of R.C. 2903.02(B), an unclassified felony; Count IV, murder (proximate result), in violation of R.C. 2903.02(B), an unclassified felony; Count V, felonious assault (deadly weapon), in violation of R.C. 2903.11(A)(2), a felony of the second degree; Count VI, felonious assault (deadly weapon), in violation of R.C. 2903.11(A)(2), a felony of the second degree; Count VII, felonious assault (serious physical harm), in violation of R.C. 2903.11(A)(1), a felony of the second degree; Count VIII, felonious assault (serious physical harm), in violation of R.C. 2903.11(A)(1), a felony of the second degree; and Count IX, tampering with evidence, in violation of R.C. 2921.12(A)(1), a felony of the third degree. With the exception of Count IX, all of the counts in Leet's indictment were accompanied by a mandatory three-year firearm specification. The trial court merged all of the firearm specifications at sentencing. We further note that the trial court merged Counts III, V, and VII with Count I. The trial court also merged Counts IV, VI, and VIII with Count II.

{¶ 2} Leet filed a timely notice of appeal with this Court on June 20, 2011.

{¶ 3} The events which form the basis for the instant appeal began on the night of February 25, 2010, and extended into the early morning hours of February 26, 2010. At approximately nine p.m. on February 25, 2010, Leet, accompanied by Kenneth Bailey and Tylor Blevins, went to a bar located in downtown Dayton, Ohio, called Hammerjax. Leet and Bailey were friends who had known each other for a few months. Blevins is Bailey's cousin. Blevins and Leet had not met each other prior to the evening in question.

{¶ 4}    Leet had picked up Bailey and Blevins in an older model red and white Chevy Suburban that was registered to him.   The three men stayed at Hammerjax until closing.   Upon leaving, Leet approached a male named Abdul Jihad who was standing outside the bar and attempted to purchase cocaine.   Jihad informed Leet that he could obtain the cocaine for $100.00, but they would have to travel a short distance to a housing apartment building called Wilkinson Plaza.   With Leet driving, the four men traveled to Wilkinson Plaza.   While Blevins and Bailey waited in the Suburban, Leet and Jihad went into the building.   After entering the building and going up some stairs, Jihad convinced Leet to hand over the money for the cocaine.   Jihad told Leet to wait in the hallway while he retrieved the drugs.   Jihad took Leet's money and walked through a doorway that ostensibly led to an apartment where he could purchase the cocaine.   The doorway, however, merely led to a stairwell that Jihad used to go downstairs and leave the building.

{¶ 5}    While waiting outside in the Suburban, Bailey observed Jihad exit the Wilkinson Plaza building and leave the area.   Bailey called Leet on his cell phone and explained that he had just seen Jihad leave the building.   Apparently realizing that he had been duped, Leet left the building and returned to his vehicle.   Leet then drove around the immediate area looking for Jihad.   Unable to locate Jihad, Leet observed an elderly male walking on the sidewalk.   While Blevins and Bailey waited in the vehicle, Leet got out and attacked the man on the sidewalk until some local residents who witnessed the assault exited their apartments and began shouting at Leet to leave the area.

{¶ 6}    Leet eventually returned to his vehicle and got in, but did not leave the vicinity.   Shortly thereafter, two men, later identified as Nathan Gay and Harvey Sims, Jr., approached Leet's vehicle and asked him what was wrong.   Leet told the two men that he

had been robbed. Leet offered Gay and Sims $100.00 each to help him find Jihad so he could get his money back. The two men agreed and got in Leet's Suburban. At this point, Bailey and Blevins asked Leet to take them home and drop them off, but Leet refused. Leet also stated that he had to stop by his house in the West Carrollton area to get the money to pay Gay and Sims.

{¶ 7} Upon arriving at his house, Leet went inside while Blevins, Bailey, Gay, and Sims waited in the vehicle. Leet came out a short time later, got back in the vehicle, and drove to an area Blevins described as "the boondocks." At this point, Leet pulled the vehicle into a long driveway, got out, and yelled at Bailey to meet him at the rear of the vehicle. Bailey testified that Leet was angry with him for not helping him after he attacked the elderly man downtown. While Leet and Bailey were talking, Gay and Sims got out of the vehicle. Bailey testified that Leet then removed a handgun from his coat and shot Gay and Sims. Bailey testified that he immediately got back in the vehicle. Leet, however, walked over to where Gay and Sims were on the ground and fired several additional shots into each man. Leet reentered the vehicle and pulled out of the driveway, backing over the body of one of the dead men while doing so.

{¶ 8} After driving a short distance away, Leet turned the vehicle around and drove back to where the bodies were located. Leet ordered Bailey and Blevins out of the vehicle in order to help him drag the bodies out of sight close to a nearby creek. As he seemed to be in shock, Blevins was unable to help. Accordingly, Leet and Bailey moved the bodies away from the driveway and down to the creek where they were later discovered by the owner of the property where the shootings occurred.

{¶ 9}   Detective Brad Daugherty of the Montgomery County Sheriff's Office was assigned to investigate the deaths of Gay and Sims.   After interviewing several individuals and reviewing surveillance tapes from the area around Wilkinson Plaza and Holden House in downtown Dayton, Det. Daugherty obtained a warrant to search Leet's vehicle and residence.   After execution of the warrant, Det. Daugherty took Leet to the police station downtown to question him regarding the deaths of Gay and Sims.

{¶ 10}   Leet was subsequently indicted on March 12, 2010, for two counts of murder (purposeful), two counts of murder (proximate result), two counts of felonious assault (deadly weapon), two counts of felonious assault (serious physical harm), one count of tampering with evidence, and one count of aggravated robbery.   Firearm specifications were attached to each count except for the tampering with evidence charge.   At his arraignment on March 16, 2010, Leet stood mute, and the trial court entered a plea of not guilty on his behalf.

{¶ 11}   On May 4, 2010, Leet filed a motion to suppress the statements he made during the interview conducted by Det. Daugherty on March 2 and 3, 2010.   A hearing was held on said motion on June 1, 2010.   In a written decision issued on September 21, 2010, the trial court overruled Leet's motion to suppress.

{¶ 12}   At the conclusion of his jury trial which began on May 23, 2011, and ended on May 27, 2011, Leet was found guilty of all of the counts in the indictment except for the aggravated robbery charge.   After merging the appropriate counts, the trial court sentenced Leet to an aggregate sentence of thirty-eight years to life in prison.

{¶ 13}   It is from this judgment that Leet now appeals.

{¶ 14}  Because we find it to be dispositive of the instant appeal, we will address Leet's second assignment of error out of sequence as follows:

{¶ 15}  "THE TRIAL COURT ERRED IN OVERRULING THE APPELLANT'S MOTION TO SUPPRESS STATEMENTS THAT WERE OBTAINED IN VIOLATION OF HIS CONSTITUTIONAL RIGHTS."

{¶ 16}  In his second assignment, Leet contends that the trial court erred when it overruled his motion to suppress the statements that he made during the interviews conducted by Det. Daugherty on March 2 and 3, 2010.  Specifically, Leet argues that while being interrogated by Det. Daugherty, he unequivocally invoked his right to counsel and that any statements he made after that point should have been suppressed.  For the following reasons, we agree that Leet's statements should have been suppressed.  However, we find that the in addition to making an unequivocal request for counsel, Leet's initial purported waiver of his constitutional rights was not made in a knowing, intelligent, and voluntary fashion.

{¶ 17}  In regards to a motion to suppress, "the trial court assumes the role of trier of facts and is in the best position to resolve questions of fact and evaluate the credibility of witnesses." *State v. Hopfer*, 112 Ohio App.3d 521, 679 N.E.2d 321 (2d Dist.1996),  quoting *State v. Venham*, 96 Ohio App.3d 649, 653, 645 N.E.2d 831 (4th Dist.1994).  The court of appeals must accept the trial court's findings of fact if they are supported by competent, credible evidence in the record. *State v. Isaac,* 2d Dist. Montgomery No. 20662, 2005-Ohio-3733, citing *State v. Retherford*, 93 Ohio App.3d 586, 639 N.E.2d 498 (2d Dist.1994).  Accepting those facts as true, the appellate court must then determine, as a

matter of law and without deference to the trial court's legal conclusion, whether the applicable legal standard is satisfied. *Id*.

{¶ 18} In *Miranda v. Arizona*, 384 U.S. 436, 478-479, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court held that a defendant who is subjected to custodial interrogation must be advised of his or her constitutional rights and make a knowing and intelligent waiver of those rights before statements obtained during the interrogation will be admissible. The warnings required by *Miranda* are satisfied where, prior to the initiation of questioning, the police fully apprise the suspect of the State's intention to use his statements to secure a conviction and inform him of his rights to remain silent and to have counsel present if he so desires. *Moran v. Burbine*, 475 U.S. 412, 420, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986).

{¶ 19} "In a pretrial suppression hearing, when the admissibility of a confession is challenged by the accused, the burden is upon the prosecution to prove compliance with *Miranda*; that a knowing, intelligent, and voluntary waiver of Defendant's rights was obtained or occurred and that the inculpatory statement was voluntary. *State v. Kassow*, 28 Ohio St.2d 141, 277 N.E.2d 435 (1971) [vacated in part on other grounds]. However, once a case for the above elements is established, the criminal defendant then has the burden of proving his claim of involuntariness. *Id*." *State v. Alford*, 2d Dist. Montgomery No. 23332, 2010-Ohio-2493, ¶ 9-10.

{¶ 20} "The waiver must have been made with full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the investigation' reveal both an uncoerced choice

and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived. (Citation omitted). In assessing whether a waiver is knowing and intelligent, 'the relevant question is not whether the criminal suspect [knew] and [understood] every possible consequence of a waiver of the Fifth Amendment privilege,' but rather whether the 'suspect [knew] that he [could] choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking any time.' *Garner v. Mitchell*, 557 F.3d 257, 261 (6th Cir.2009), quoting *Colorado v. Spring*, 479 U.S. 564, 573-74, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987)." *United States v. Adams*, 583 F.3d 457 (6th Cir.2009).

{¶ 21} In *State v. Edwards*, 49 Ohio St.2d 31, 358 N.E.2d 1051 (1976), vacated in part on other grounds, 438 U.S. 911, 98 S.Ct. 3147, 57 L.Ed.2d 1155 (1978), the Supreme Court of Ohio stated as follows:

> In deciding whether a defendant's confession is involuntarily induced, the court should consider the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement.

*Id*. at paragraph two of the syllabus; *In re Watson*, 47 Ohio St.3d 86, 88, 548 N.E.2d 210 (1989) (following *Edwards*).

{¶ 22} The following excerpt is from the recorded portion of Det. Daugherty's custodial interrogation of Leet on March 2, 2010:

**Det. Daugherty**: Today is Tuesday,

March 2, 2010. It's 22.35 hours.

Present in the interview room is myself,

Det. Daugherty, Det. Mike Clymer, and

Gregory Leet.

\*\*\*

Previously, you were advised of your *Miranda* rights? Is that correct?

**Leet**: Yeah.

Q: Ok. And you've asked that I read them to you again? Is that correct?

A: Yeah.

Q: Ok, and I'm going to do that here. You're being interviewed in regards to the death of Harvey Sims and Nathan Gay. Before we ask you, uh, before we ask you any questions you must understand your rights, do you understand that?

A: Yeah.

Q: Ok. Number one, you have the right to remain silent. You don't have to make any statements or answer any questions, do you understand that?

A: Yes.

Q: Number two. Anything you say can and will be used against you in a court of law, do you understand that?

A: Yes.

Q: Number three. You have the right to talk to a lawyer for advice before we ask you any questions and have a lawyer with you during questioning, do you

understand that?

A: *You can have a lawyer with you during the questioning?*

Q: Um-hmm. That's what I told you before. Do you understand that?

A: Yeah.

Q: Ok. Number four. If you do not have the money to hire a lawyer, a lawyer appointed by the Court, or a lawyer from the Public Defender's Office will be provided to you before and during questioning without any cost to you. Do you understand that?

A: Yeah.

Q: Number five. If you decide to answer questions now without any lawyer present, you will still have the right to stop answering questions at any time. You also the right to stop answering questions any time, uh sorry, stop answering questions any time until you talk to a lawyer. Do you understand that?

A: Yes.

Q: Ok. Uh, previously you read the waiver portion out loud, would you like to read that again?

A: Uh, [reading] "the above statements of rights has been read to me. I understand my rights are [sic]. I am willing to make a statement and answer questions. I do not want a lawyer." *I do want a lawyer.*

Q: Ok. Now you're saying you do want a lawyer?

A: *Yeah, if I can have one during questioning.*

Q: Ok. Now you were advised of this, of this form before, correct?

A: I didn't understand that I could have a lawyer during present [sic].

Q: Ok, but this form was read to you earlier, is that correct?

A: *Yes, but I did not know I was allowed to have a lawyer while I was being questioned.*

Q: Ok, but you, I mean I read this to you before, right? Just, I mean, it's a yes or no question. Did, were you read your *Miranda* forms and you signed and waived it earlier?

A: Yeah.

Q: Ok, but now you're saying you want an attorney before we finish any more questioning, is that what you're saying?

A: If one can be here tonight.

Q: Ok, well, um, you know, we won't be able to get one here tonight, ok? You know, so we can, if you want, we can take you over to the jail and then we can try to finish questioning later, or we can continue tonight.

A: How does it work with........

Q: Well, everyone has their right to an attorney, ok. So, I mean, it's right, you know, you can waive that right and agree to speak with us, you know, like you did earlier, or, you know, if you want an attorney then that's something we'll have to do, you know, *a later date*.

A: How much later is the question.

Q: What's that?

A: Will it be took care of tomorrow?

Q: I don't know. That will be up to, you know, the attorney the you get. Ok, so that's up, that would be between you and your attorney. It's up to you.

A: So all that stuff be allowed to be used since I'm asking for an attorney now?

Q: Uh huh, yeah, yeah, 'cause you waived your rights earlier, ok. So everything you told us already, uh, will be used obviously.

A: And all that's being recorded?

Q: Yeah, it's all being recorded right now. Uh huh, yep.

A: Guess I'll talk.

Q: Ok, well, my question is, do you w–, do you w–, want us, continue talking with us without an attorney?

A: Yes –

Q: Ok.

A: and I would like to have a attorney to talk to tomorrow if that's possible.

Q: Ok, alright, ok, alright, well let's, let's start off at the beginning. ***

{¶ 23} Initially, we note that the trial court specifically found that Leet's requests for clarification and confusion with respect to his right to an attorney during questioning did "not mean that he lacked the capacity to process and make decisions regarding his [constitutional] rights." In support of its conclusion, the trial court relied on the testimony of Det. Daugherty that Leet did not appear to be under the influence of drugs or alcohol and

that he "seemed alert and aware during all three interviews."   The trial court also relied on the report of Dr. Barbra A. Bergman who interviewed Leet regarding his capacity to make a knowing and intelligent waiver of his rights.   Among her various findings, Dr. Bergman concluded that Leet "was capable of comprehending the purpose or value of consultation with an attorney in the interrogation situation."   In our view, however, the record does not support a conclusion that the State met its burden to establish a knowing, intelligent, and voluntary waiver.   The U.S. Supreme Court has characterized this as a "heavy burden." *Miranda*, 384 U.S. 436.

{¶ 24}   Det. Daugherty questioned Leet after he was taken into custody.   Det. Daugherty testified that he informed Leet of his *Miranda* rights prior to questioning him and that Leet stated that he understood his rights.   Det. Daugherty advised Leet of his *Miranda* rights using the Sheriff Office's standard pre-interview form.   Det. Daugherty testified that after he read each of the rights on the form to Leet, he then obtained an oral acknowledgment from Leet that he understood each of his rights.   Leet also read the waiver of rights portion of the form to Detective Daugherty before the recorded portion of the interrogation began. Despite the fact that Det. Daugherty indicated that he had previously read Leet his *Miranda* rights prior to the beginning of the recording, it is apparent from Leet's responses during questioning that he did not understand that he had a right to counsel while being interrogated by the police.   This is clearly evident when after being informed by Det. Daugherty that he had the right to the advice of counsel before and during questioning, Leet responded by asking "you can have a lawyer with you during your questioning?"   Leet's response establishes that up to that point in the interrogation, he did not clearly comprehend his

constitutional rights, and therefore, did not knowingly, intelligently, and voluntarily waive those rights, specifically his right to counsel before and during questioning.

{¶ 25} This conclusion is further supported by Leet's recorded responses later during the interrogation. In fact, once he understood that he had a right to counsel while being questioned, he unequivocally informed Det. Daugherty that he wanted an attorney after reading a portion of his waiver of rights aloud himself. Instead of immediately ending the interrogation and procuring an attorney for Leet, Det. Daugherty reiterated to the defendant that he had previously read and signed a waiver of rights form. Leet, however, stated twice that he did not understand that he could have an attorney present before and during questioning. Det. Daugherty disregarded Leet's lack of understanding of his rights and further stated that they wouldn't be able to get an attorney for him that night. Det. Daugherty further informed Leet that he would have to take him to jail until an attorney could be available to advise him. Det. Daugherty informed Leet that he did not know when an attorney would be available. The audiotape recording of this exchange supports Leet's argument he did not understand that he had a right to counsel during questioning, and the Detective's responses are indicative of an approach by law enforcement that an attorney could be secured at a "later date." Det. Daugherty's continued interrogation after Leet unambiguously requested counsel was violative of his *Miranda* rights, as was his initial questioning since Leet did not understand the fact that counsel should be made available during questioning.

{¶ 26} Further, we note that Dr. Bergman's conclusion that Leet had the capacity to knowingly and intelligently waive his right to counsel was not the issue for the trial court's

determination. The issue was not Leet's capacity to waive his rights but rather did he do so knowingly, intelligently, and voluntarily with a clear understanding of them. Dr. Bergman's report stated that based on his performance on the Wechsler Adult Intelligence Scale, Leet's ability to "process and understand input is his weakest cognitive ability." While all other areas of cognitive ability fell within the borderline to low normal range, his ability to process and understand input fell within the mild mentally retarded range to the low normal range. Dr. Bergman's report reveals that Leet manifested a pronounced degree of difficulty when attempting to understand and process information. Given his responses and requests for counsel during Det. Daugherty's interrogation, Dr. Bergman's report lends additional support to a finding that Leet did not make a knowing, intelligent, and voluntary waiver of his rights. This is also evident from Leet's response to Dr. Bergman's request for him to paraphrase item number three from the *Miranda* pre-interview form used by Det. Daugherty. Item number 3 of the pre-interview form states that "[y]ou have the right to talk to a lawyer for advice before we ask you any questions and to have a lawyer with you during questioning." Significantly, Leet responded that he understood the right to mean "[y]ou can talk to us tomorrow or you can sit in the county jail until you can have an attorney present until tomorrow, when we can get one. Yet, you are not under arrest."

{¶ 27} Finally, we acknowledge that the State adduced evidence at the suppression hearing that Leet had one identified prior experience regarding the waiver of his constitutional rights. Specifically, the State called Det. Robert A. Schmidt of the Moraine Police Department to testify about his investigation of Leet in a 2001 corruption of a minor

case.[1] Det. Schmidt testified that he advised Leet of his constitutional rights using a *Miranda* pre-interview form. Leet signed the form and wrote his initials next to each enumerated right. Det. Schmidt further testified that Leet did not have any questions about the waiver, and he provided a written and verbal statement.

{¶ 28} During cross-examination, however, Det. Schmidt acknowledged that when he interviewed the defendant in 2001, Leet was not under arrest, he was not handcuffed, and he was free to leave at any time. Significantly, Det. Schmidt also testified that he was aware that at the time of the interview in 2001, Leet had recently been in an automobile accident in which he had sustained a head injury. Clearly, the circumstances surrounding Leet's interview in 2001 by Det. Schmidt differed significantly from his interrogation by Det. Daugherty in 2010. Thus, we conclude that this singular prior *Miranda* warning in 2001 is of minimal value in establishing that Leet knowingly and intelligently waived his right to counsel in 2010.

{¶ 29} We cannot conclude that there is a clear showing, on this record, of an intention, intelligently exercised, to relinquish known and understood rights. We hold that the State failed in its burden to establish by a preponderance of the evidence that the police complied with *Miranda* and that Leet's statements during the interrogation were knowingly, intelligently, and voluntarily made. Accordingly, we find that the trial court erred when it overruled Leet's motion to suppress.

{¶ 30} Leet's second assignment of error is sustained.

---

[1] The record does not establish whether this was a felony or misdemeanor investigation.

{¶ 31} Leet's remaining assignments of error are as follows:

{¶ 32} "APPELLANT WAS DENIED HIS CONSTITUTIONALLY GUARANTEED RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WHEN THE TRIAL COURT ALLOWED UNQUALIFIED APPOINTED CO-COUNSEL TO TAKE AN ACTIVE ROLE IN THE JURY TRIAL AND CO-COUNSEL WAS IN FACT INEFFECTIVE AT TRIAL."

{¶ 33} "THE JURY'S VERDICTS SHOULD BE REVERSED AS THEY WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

{¶ 34} "THE TRIAL COURT ERRED WHEN IT ORDERED APPELLANT TO PAY COURT COSTS EVEN THOUGH HE HAS NO PRESENT OR FUTURE ABILITY TO PAY SUCH A FINANCIAL SANCTION."

{¶ 35} In light of our disposition regarding Leet's second assignment of error, his remaining assignments are rendered moot.

{¶ 36} Leet's second assignment of error having been sustained, his conviction is reversed, and this matter is remanded for proceedings consistent with this opinion. The statements that Leet made to police during his interrogation of March 2 and 3, 2010, which incriminate him in the deaths of Nathan Gay and Harvey Sims, Jr., are ordered suppressed.

. . . . . . . . . .

GRADY, P.J., concurs.

FROELICH, J., concurring in part and dissenting in part:

{¶ 37} On March 2 at 9:01 p.m., the defendant signed a pre-interview form and

spoke with detectives. At approximately 9:50 p.m., the defendant agreed to provide a recorded statement and, after a short break, the defendant was reread his rights as the majority opinion details.

{¶ 38} I agree with the majority that once the defendant made what, as a matter of law, is an unequivocal request to have an attorney, the second interview should have stopped and there should not have been further law enforcement-initiated dialogue about his apparent change of mind, that an attorney was not available at that time of night, or anything else. Therefore, I concur in the reversal of the trial court's decision regarding the second statement.

{¶ 39} The burden is on the State to prove that this in-custody suspect made a knowing, voluntary, and intelligent waiver of his constitutional rights before any responses to questioning can be admitted. The difficulty in this case arises because, despite the motion and argument to suppress all statements, the testimony at the hearing mostly focused on the pre-interview conversation at the second interview and its effect on the subsequent statement of the defendant – not on the pre-interview process at the first interview or the impact of the defendant's remarks during the second pre-interview process on the first statement's apparent waiver.

{¶ 40} From the record, including the psychologist's report and the exhibits, the State met its burden to show a knowing, voluntary, and intelligent waiver prior to the first interview. However, as the majority rightly concludes, the defendant's remarks at the second pre-interview process bring into doubt whether he comprehended, when he was advised prior to the first interview, that he could have an attorney during questioning; and

thus whether his first waiver was intelligently made.

{¶ 41}  Appellate courts bring to litigated disputes attributes that a trial court could not possibly possess – distance, the opportunity for reflection, and hindsight.[2]  We are often compared to desk-bound commanders who retrospectively analyze a battle and then decide what the combatants "should have done."

{¶ 42}  The trial court found that the "statements made by the defendant to Detective Daugherty were made after Defendant knowingly, voluntarily, and intelligently waived his constitutional rights."  I cannot say, as a matter of law with regard to the first statement, that this finding was not supported by competent, credible evidence or, on this record, that the court erred by failing to apply the correct legal standard when it found the first statement was made after a knowing, voluntary, and intelligent waiver.

{¶ 43}  I would reverse the trial court's ruling regarding the second statement and remand the case for further proceedings; I would affirm the denial of the motion to suppress regarding the first statement.

. . . . . . . . . .

Copies mailed to:

R. Lynn Nothstine
Marshall G. Lachman
Hon. Mary Katherine Huffman

---

[2]  Dalton, *Taking the Right to Appeal (more or less) Seriously*, 95 Yale L.J. 62, 100 (Nov. 1985).