IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
October 13, 2015 Session

## STATE OF TENNESSEE v. CHRISTOPHER LEE BYRGE

**Appeal from the Circuit Court for Anderson County**
**No. BOC00645     Donald Ray Elledge, Judge**

_____

**No. E2015-00014-CCA-R3-CD – Filed December 3, 2015**
_____

Defendant, Christopher Lee Byrge, was convicted of aggravated sexual battery and received a nine-year sentence. He appeals his conviction, arguing that: (1) the trial court erred in denying Defendant's motion to suppress his admissions; (2) the trial court erred by not requiring the State to elect the specific date on which the alleged offense occurred; (3) the trial court erred by giving a sequential jury instruction; (4) the trial court erred in denying Defendant's request for a special jury instruction on corroboration of admissions against interest; and (5) the evidence was insufficient to support his conviction. After a careful review of the parties' briefs, the record, and the applicable law, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

J. Thomas Marshall, Jr., District Public Defender, for the appellant, Christopher Lee Byrge.

Herbert H. Slatery III, Attorney General and Reporter; Lacy Wilber, Senior Counsel; Dave Clark, District Attorney General; and Sandra Donaghy, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

This is Defendant's direct appeal from an Anderson County jury's guilty verdict, convicting him of the aggravated sexual battery of his then three-year-old daughter.

## I. Procedural History

Prior to the trial, the State moved to amend the date contained in the indictment from "on or about September 8, 2009" to "on or between the dates of December 15, 2009, to December 27, 2009." The week before Defendant's trial began, the State filed a supplement to its previous motion to amend the indictment, requesting that the offense date be expanded to "on or between the dates of September 8, 2009, to December 27, 2009." Defendant filed an objection to the supplement.

After a jury trial, Defendant was convicted as charged and received a nine-year sentence, as a standard offender, which is required by law to be fully served in incarceration. The trial court denied Defendant's motion for new trial and judgment of acquittal, and Defendant filed a notice of appeal.

## II. Facts

Danielle Ward testified that she lived in Maryville with her boyfriend Josh Lynn and her three children. Ms. Ward and Defendant have a daughter, K.B., who was born on September 8, 2006. Ms. Ward and Defendant married in July 2007. Ms. Ward worked and Defendant primarily stayed at home to care for K.B, occasionally working temporary jobs. The couple had marital difficulties, and Ms. Ward demanded a divorce in September 2009. She asked Defendant to move out of their home in Oak Ridge, but he did not, so she moved in with Mr. Lynn, whom she knew from work. At the time of trial, Defendant and Ms. Ward were not legally divorced.

While they were separated, Defendant continued to watch K.B. while Ms. Ward worked, but Ms. Ward kept K.B. when she was not working. The couple began having problems sharing custody of K.B. during November 2009. After several weeks of conflict, they reached an informal agreement about K.B.'s living arrangement: Defendant would keep K.B. while Ms. Ward worked during the week, and Ms. Ward would keep the child for two or three days each week whenever she was not working. To exchange custody, Ms. Ward would drop off K.B. at the home of either of Defendant's parents. At this time, Defendant was living with his mother within the city limits of Oak Ridge on Royce Circle. Because Defendant kept K.B. during Thanksgiving of 2009, they agreed that Ms. Ward would keep K.B. on Christmas Day and several days thereafter. Defendant kept her on Christmas Eve.

On approximately December 28, 2009,[1] Ms. Ward and K.B. were sitting in a swing on the front porch. As K.B. got off of the swing, she exclaimed, "Ow!" When Ms.

---

[1] On cross-examination, Ms. Ward testified that these events occurred between December 25th and 30th, but she could not recall the exact dates.

Ward inquired into the cause of the child's discomfort, K.B. appeared nervous. K.B. indicated that her "private" hurt. When Ms. Ward examined K.B.'s vagina, it appeared red and irritated. During the conversation, K.B. told her mother that Defendant "did something really, really bad." Ms. Ward discussed what K.B. revealed to her with Mr. Lynn and her mother. On December 29, 2009, Ms. Ward called the child abuse hotline to report the incident because the Department of Children's Services ("DCS") was closed during the holidays.

When Ms. Ward called Defendant and confronted him about what she learned from K.B., Defendant became upset and began crying. He begged Ms. Ward not to take K.B. to a doctor for an examination and told her that he needed to be present if K.B. went to a doctor. Ms. Ward told Defendant that she was reporting the incident to DCS, but "he did not want [her] to do that." During the conversation, Defendant suggested that Mr. Lynn was responsible for what happened or, alternatively, that maybe K.B. fabricated the story after watching an animated adult television show titled, "Family Guy." Defendant liked and watched the show, which Ms. Ward described as "inappropriate" with "cruel humor" and "not good for children at all."

Ms. Ward took K.B. to the emergency room, and K.B. was diagnosed with a urinary tract infection ("UTI") during that visit. The doctor did not prescribe antibiotics because K.B.'s white blood cell count was too low. Instead, they told Ms. Ward to ensure that K.B. drank plenty of fluid. K.B. also previously had a UTI around October 2009 and was given antibiotics. Overall, Ms. Ward opined that K.B. has had two or three UTI's "in her entire life."

Heather Bowers was an investigator for the Department of Children's Services. On the afternoon of December 29, 2009, DCS received a call about K.B., and the case was assigned to Ms. Bowers. Because the victim resided in a different county than the one where the offense occurred, Ms. Bowers requested a courtesy interview of the victim at the Child Advocacy Center ("CAC") in Loudon County. Ms. Ward took K.B. to the CAC, and a forensic examination was conducted. Subsequently, K.B. began receiving counseling at the CAC.

After the CAC interview, Ms. Bowers called Defendant to set up an interview. During the phone call, Defendant acknowledged that Ms. Ward had already informed him of the allegations. Defendant agreed to an interview at the Oak Ridge Police Department on January 14, 2010. Defendant was first interviewed by Ms. Bowers and Detective Ron Boucher of the Oak Ridge Police Department. Defendant denied touching K.B. However, he said that K.B. told him about an occasion when Mr. Lynn made K.B. let him touch her in order to get Playdoh. Defendant said that he did not call the police after learning about this incident. This first interview lasted for about forty minutes, after

which they took a break, and Defendant left the police station. He returned that afternoon for additional questioning.

Defendant agreed to a separate interview with Special Agent Mike Hannon of the Tennessee Bureau of Investigation. Before the interview, Special Agent Hannon read Defendant his *Miranda* rights verbatim from a waiver of rights form. Defendant appeared to understand his rights and signed the form. Defendant's waiver was also witnessed by Ms. Bowers and Detective Boucher, who also signed the waiver of rights form in addition to Special Agent Hannon. Defendant was then interviewed alone by Special Agent Hannon.[2]

Ms. Bowers and Detective Boucher later rejoined Special Agent Hannon and Defendant for another joint interview. Detective Boucher verified that Defendant remembered his rights and reminded him that those rights were still available. During this interview, Defendant initially continued to deny the allegations, but eventually he became "almost tearful." Defendant admitted that there was one occasion when he gave K.B. a bath, and as he was drying her off, he laid her down on a towel and touched her when checking for a UTI. Defendant said that he licked his finger before he touched K.B., but he told Detective Boucher that he did not know why he touched her. Upon request, Defendant then wrote and signed the following statement:

> Sometime in Nov. 2009, I gave [K.B.] a bath [and] when I got her out, I licked my finger [and] touched her 1 time [and] then I stopped [and] never have done it again. I laid her down on a towel to check her because of her UTI's [and] that's when it happened.

K.B. testified that at that the time of trial, she was six years old and in first grade at school. After identifying the "private part" on a diagram of a young girl, K.B. testified that Defendant had touched her private part. This touch happened in the bathroom of Defendant's mother's house. She said that Defendant only touched her on one occasion, but she could not remember specifically when it happened. At one point, she said it happened on the same day that she slid off the porch swing and hurt her herself. K.B. remembered telling her mother about what happened when they were sitting together on the swing, and she remembered being three years old at the time Defendant touched her.

Describing the contact, she said, "[I]t was for a long time, and I felt kind of funny for a little while." The funny feeling was a "hurt funny" rather than a "tickling funny." Defendant did not say anything before or after he touched her, but afterward, he put his finger in his mouth and licked his finger. K.B. was getting dressed because Ms. Ward

---

[2] Although described to the jury as an interview, Special Agent Hannon was administering a polygraph test to Defendant, which is discussed in more detail below.

was coming to pick her up. At one point during cross-examination, K.B. said Defendant touched her on the outside of her long pants, but later, she said that it was inside her clothes. When defense counsel asked her about the inconsistency, she said that she could not remember which it was. K.B. acknowledged that there were times when it hurt her to urinate.

## III. Analysis

Defendant raises the following issues on appeal: (1) whether the trial court erred in denying Defendant's motion to suppress his admissions; (2) whether the trial court erred by not requiring the State to identify when the alleged offense occurred within the date range provided by the indictment; (3) whether the trial court erred by giving a sequential jury instruction over Defendant's objection; (4) whether the trial court erred in denying Defendant's request for a special jury instruction on corroboration of admissions against interest; and (5) whether the evidence at trial was sufficient to support his conviction.

### A. Suppression of Admissions and Statement

#### 1. Facts from Suppression Hearing

Prior to trial, Defendant filed a motion to suppress the statements that he made to Detective Boucher and Special Agent Hannon. The trial court held a suppression hearing on April 24, 2012.

Detective Boucher testified that he had twenty-five years of law enforcement experience. He could not recall who requested the interview with Defendant, but Defendant came to the police station voluntarily at the set time. When Defendant arrived, he was directed from the lobby to an interview room. He was not handcuffed or physically restrained. The interview room is "a medium-sized room with one door leading into the hallway [and] one door leading into the lab area which has no exit," but the latter door is locked. At the table in the interview room, Defendant sat closest to the door, Detective Boucher sat at the opposite end of the table, and Ms. Bowers sat between them. The door to the room was closed but unlocked during the interview.

When Detective Boucher began the interview, he gathered "some clerical information" from Defendant before asking him questions about the case. Eventually, Detective Boucher asked if Defendant would submit to a polygraph test, and Defendant agreed. Special Agent Hannon was a TBI polygraph examiner, and he was present at the police station for an investigation on a different case. Special Agent Hannon agreed to administer the test to Defendant.

The initial interview lasted from approximately 10:23 a.m. to 11:00 a.m. When the polygraph test was scheduled for the afternoon, Detective Boucher permitted Defendant to leave the police station and asked him to return at 1:00 p.m. for the polygraph test. Defendant returned voluntarily. Detective Boucher took him to a different room and introduced him to Special Agent Hannon. The room was "rather large." Detective Boucher observed Special Agent Hannon advise Defendant of his *Miranda* rights. Detective Boucher and Ms. Bowers signed the waiver of rights form as witnesses. Detective Boucher and Ms. Bowers then left the room. The polygraph test lasted under two hours.

After Special Agent Hannon completed the polygraph test, he informed Detective Boucher that the test results indicated that Defendant was being deceptive. Detective Boucher conducted a second interview with Defendant in the presence of Special Agent Hannon and Ms. Bowers. One of the officers reminded Defendant of his rights and told him that those were still available. Defendant continued to deny touching his daughter inappropriately, but eventually he verbally admitted that on one occasion after giving K.B. a bath, he laid her on a towel, licked his finger, and touched her vagina.

Defendant then made a written statement. Defendant was given a lined piece of paper to write the statement on his own. No one instructed him as to what the statement should say. After Defendant finished writing the statement, Detective Boucher, Special Agent Hannon, and Ms. Bowers signed the statement as witnesses. The statement was consistent with his verbal admission. The second interview concluded several minutes before 4:00 p.m. Detective Boucher told Defendant that he would contact him later, and Defendant was permitted to leave the police station.

Detective Boucher did not recall Defendant ever asking to speak with an attorney. Detective Boucher denied that anyone told Defendant that he could receive counseling and be reunited with his daughter after six months if Defendant admitted to what happened. During the first and second interviews, no one's voice was raised to Defendant, and everyone remained seated during the interviews.

Special Agent Hannon testified that he had twenty-nine years of law enforcement experience and had been employed by the TBI for sixteen years. During his career, he administered over 800 polygraph tests and probably had done around 400 at the time he administered the test in this case.

Before the polygraph test, Special Agent Hannon explained to Defendant how the process would happen. He then advised Defendant of his constitutional rights and had Defendant sign a consent form for the polygraph test. He told Defendant that he could terminate the test at any time. He also told Defendant that the test would not be recorded unless requested by Defendant and that Defendant would not receive a copy of the

polygraph test unless he requested one in person in Knoxville and paid forty dollars. However, Special Agent Hannon told Defendant that the investigating officer usually provided a free copy of the report to a defendant, if the officer requested a copy from the TBI.

Special Agent Hannon gave Defendant a ten or fifteen minute break before administering the polygraph test and gave him another break after the test but before informing him of the results. Defendant never indicated that he wanted to leave or terminate the test. Defendant did not ask for an attorney. Defendant did not outwardly react to the results of the polygraph test, and his demeanor remained the same. Neither Special Agent Hannon nor anyone else spoke or acted harshly to Defendant. No one forced or pressured Defendant into making his statement.

Defendant testified that after Ms. Ward told him that she made a report to DCS, someone from DCS called him to set up an interview. Defendant ended up scheduling the interview with Detective Boucher. After being interviewed by Detective Boucher, Detective Boucher told Defendant that he "had to stay there." However, Defendant left the police station anyway and went to a gas station and bought cigarettes.

Defendant agreed to a polygraph test. Special Agent Hannon read the *Miranda* rights, and Defendant signed the waiver form. Defendant then signed the polygraph consent form, which he thought was "pretty much the same thing." After the polygraph test, Defendant went outside of the police station and smoked.

After the break, Detective Boucher retrieved Defendant and "said it wasn't looking good for [Defendant] after the polygraph test, and [Defendant] could be looking at a lot of jail time, or [Defendant] could just write a statement and . . . get counseling and [he] and [his] daughter could be back together." During the second interview, Detective Boucher told Defendant that he failed the polygraph test "106%," which sounded "kind of strange" to Defendant. They proceeded to question Defendant "over and over on the same thing." Eventually, Defendant made the written statement because he had been there "so long" and it "just kind of seemed like [his] way out." Detective Boucher told Defendant that he "could go to jail or tell them [he] did something and leave." Defendant "told him what he wanted to hear" so that Defendant could leave.

Defendant requested to leave several times, but no one in the room acknowledged him. At some point, Defendant asked for a lawyer, but Detective Boucher told Defendant that he had "already turned it down twice" and asked why Defendant "want[ed] one now." Defendant did not feel that he was free to leave the police station at any time because Detective Boucher had told him during the first break that he was not free to leave.

After the hearing, the trial court denied the motion to suppress, making detailed findings on the record.

### 2. Standard of Review and Applicable Authorities

In reviewing a trial court's ruling on a motion to suppress, this Court will uphold the trial court's findings of fact "unless the evidence preponderates otherwise." *State v. Bell*, 429 S.W.3d 524, 528 (Tenn. 2014) (citing *State v. Climer*, 400 S.W.3d 537, 556 (Tenn. 2013)). Witness credibility, the weight and value of the proof, and the resolution of conflicts in the proof "are matters entrusted to the trial court as the trier of fact." *Id*. at 529. "The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000) (quoting *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996)). The trial court's resolution of questions of law and application of the law to the facts are reviewed de novo with no presumption of correctness. *State v. Day*, 263 S.W.3d 891, 900 (Tenn. 2008). When reviewing a trial court's ruling on a motion to suppress, this Court "may consider the entire record, including not only the proof offered at the hearing, but also the evidence adduced at trial." *State v. Williamson*, 368 S.W.3d 468, 473 (Tenn. 2012) (citing *State v. Henning*, 975 S.W.2d 290, 297-99 (Tenn. 1998)).

The constitutions of the United States and Tennessee protect a suspect from "being compelled to give evidence against himself." *State v. Berry*, 141 S.W.3d 549, 576 (Tenn. 2004) (citing U.S. Const. amend. V; Tenn. Const. art. I, § 9); *see also State v. Turner*, 305 S.W.3d 508, 515 (Tenn. 2010). Statements made during the course of a custodial police interrogation are inadmissible at trial unless the State establishes that the defendant was advised of his right to remain silent and his right to counsel and that the defendant then waived those rights. *Miranda v. Arizona*, 384 U.S. 436, 471-75 (1966); *see also Dickerson v. United States*, 530 U.S. 428, 444 (2000); *Stansbury v. California*, 511 U.S. 318, 322 (1994). A defendant's rights to counsel and against self-incrimination may be waived as long as the waiver is made voluntarily, knowingly, and intelligently. *Miranda*, 384 U.S. at 478; *State v. Middlebrooks*, 840 S.W.2d 317, 326 (Tenn. 1992).

To determine whether a suspect is in custody for the purposes of *Miranda*, the question is "whether, under the totality of the circumstances, a reasonable person in the suspect's position would consider himself or herself deprived of freedom of movement to a degree associated with formal arrest." *State v. Dailey*, 273 S.W.3d 94, 102 (Tenn. 2009) (quoting *State v. Anderson*, 937 S.W.2d 851, 855 (Tenn. 1996)). This determination is a "very fact specific inquiry" and requires an "objective assessment" of the following non-exclusive list of factors:

the time and location of the interrogation; the duration and character of the questioning; the officer's tone of voice and general demeanor; the suspect's method of transportation to the place of questioning; the number of police officers present; any limitation on movement or other form of restraint imposed on the suspect during the interrogation; any interactions between the officer and the suspect, including the words spoken by the officer to the suspect, and the suspect's verbal or nonverbal responses; the extent to which the suspect is confronted with the law enforcement officer's suspicions of guilt or evidence of guilt; and finally, the extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will.

*Id.* (quoting *Anderson*, 937 S.W.2d at 855).

Encompassed within the federal and state constitutional provisions is the right to counsel. *Miranda*, 384 U.S. at 444. "[A]fter a knowing and voluntary waiver of the *Miranda* rights, law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney." *Davis v. United States*, 512 U.S. 452, 455 (1994). An "[i]nvocation of the *Miranda* right to counsel 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.'" *Id.* at 459 (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991)). "When a suspect invokes the right to counsel, police must cease questioning until counsel is present" or the suspect initiates further conversation with the police. *State v. Saylor*, 117 S.W.3d 239, 246 (Tenn. 2003) (citing *Miranda*, 384 U.S. at 444-45; *Edwards v. Arizona*, 451 U.S. 477 (1981); *State v. Stephenson*, 878 S.W.2d 530, 548 (Tenn. 1994)).

The test for voluntariness under the Tennessee Constitution is broader and more protective of individual rights than under the Fifth Amendment. *State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996). The voluntariness of a confession "remains distinct from *Miranda*." *State v. Climer*, 400 S.W.3d 537, 567 (Tenn. 2013) (citing *Dickerson*, 530 U.S. at 434-35). Because "coerced confessions are inherently unreliable," only voluntary confessions may be admitted as evidence. *Id.* (citing *Dickerson*, 530 U.S. at 433). It has long been held that for a statement to be voluntary, it "must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence." *State v. Kelly*, 603 S.W.2d 726, 727 (Tenn. 1980) (quoting *Bram v. United States*, 168 U.S. 532, 542-43 (1897)). "A defendant's subjective perception alone is not sufficient to justify a conclusion of involuntariness in the constitutional sense." *Smith*, 933 S.W.2d at 455. Rather, "coercive police activity is a necessary predicate to finding that a confession is not voluntary." *Id.* (quoting *State v. Brimmer*, 876 S.W.2d 75, 79 (Tenn. 1994)); *see also State v. Downey*, 259 S.W.3d 723,

733 (Tenn. 2008) (stating that "for a confession to be involuntary, it must be the product of coercive state action").

However, "[p]romises of leniency by state officers do not render subsequent confessions involuntary *per se*: 'The Fifth Amendment does not condemn all promise-induced admissions and confessions; it condemns only those which are *compelled* by promises of leniency.'" *Smith*, 933 S.W.2d at 455 (emphasis in original) (quoting *Kelly*, 603 S.W.2d at 729). The determinative question is "whether the behavior of the State's law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined." *Kelly*, 603 S.W.2d at 728 (quoting *Rogers v. Richmond*, 365 U.S. 534, 544 (1961)); *see also Climer*, 400 S.W.3d at 568 ("[T]he essential inquiry under the voluntariness test is whether a suspect's will was overborne so as to render the confession a product of coercion." (citing *Dickerson*, 530 U.S. at 433-35; *Smith*, 933 S.W.2d at 455)).

In order to determine the voluntariness of a statement, a court must "examine the totality of the circumstances surrounding the giving of a confession, 'both the characteristics of the accused and the details of the interrogation.'" *Climer*, 400 S.W.3d at 568 (quoting *Dickerson*, 530 U.S. at 434); *see also Monts v. State*, 400 S.W.2d 722, 733 (Tenn. 1966). Factors relevant to this determination include:

> [T]he age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured[,] intoxicated[,] or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep[,] or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse.

*Id.* (alterations in original) (quoting *State v. Huddleston*, 924 S.W.2d 666, 671 (Tenn. 1996)); *see also State v. Blackstock*, 19 S.W.3d 200, 208 (Tenn. 2000) (recognizing that no single factor is necessarily determinative).

*3. Analysis*

The trial court found that Defendant was not in custody during the interviews and was properly advised of his *Miranda* rights. The trial court did not find Defendant's testimony to be credible. Accepting the trial court's credibility determination, we agree

that Defendant was not in custody when he made verbal admissions and the written statement and also agree that he never requested an attorney.

In this case, Defendant voluntarily went to the police station for the acknowledged purpose of being questioned about allegations of abuse of his daughter. Defendant was first questioned by Detective Boucher in the presence of Ms. Bowers of DCS in a "medium-sized" interview room. Defendant sat nearest to the door, which was unlocked but closed, which is not surprising given the topic of the conversation—child molestation. Detective Boucher sat on the opposite end of the table from Defendant. Defendant was not handcuffed or physically restrained. The tone of the conversation was mild-mannered and lasted only forty minutes. After agreeing to a polygraph test, Defendant was given a significant break of about two hours, during which he left the police station.

Before the polygraph test, Special Agent Hannon read Defendant his constitutional rights verbatim from the waiver of rights form, and Defendant signed the form. Defendant also signed a separate form giving consent to the polygraph test and was specifically informed by Special Agent Hannon that he could terminate the polygraph test at any time. He was given a ten to fifteen minute break before the test. The polygraph test itself lasted approximately an hour and a half and was administered in a room larger than the room where the first interview occurred. After the test, Defendant was given another ten to fifteen minute break, during which he left the police station to smoke a cigarette, before being informed of the unfavorable results.

After the polygraph test, the tenor of the second interview became more accusatory. However, before the second interview began, Defendant was again reminded of his constitutional rights. He was never physically restrained and neither the officers nor the DCS worker raised their voices during the interview. Defendant was not made any promises about lenient treatment and was not coerced into making the admissions or writing the statement. Defendant never asked for an attorney and never asked to leave. Defendant was allowed to leave the police station after the second interview was concluded.

Under the totality of the circumstances, we conclude that Defendant was not subjected to custodial interrogation. Accordingly, Defendant need not have been advised of his *Miranda* rights at all. However, Defendant was so advised prior to the polygraph test and the second interview; therefore, even if he had been in custody, his admissions and written statement would have been admissible because he knowingly and voluntarily waived his constitutional rights. Similarly, the foregoing facts demonstrate that the admissions and statements were made voluntarily and not as the result of Defendant's will being overborne by his interviewers. Defendant is not entitled to relief on this issue.

## B.  Identification of Offense Date

Defendant argues that the trial court should have required the State to "elect" the date on which the crime allegedly occurred.  Prior to trial, the State filed a motion to amend the indictment followed by a supplement to that motion.  The indictment was amended to allege that the crime occurred within the time frame of September 8, 2009, to December 27, 2009.[3]

Generally, the State "must elect at the close of its case-in-chief the particular offense for which it is seeking a conviction."  *State v. Courtney Knowles*, 470 S.W.3d 416, 423 (Tenn. 2015) (citing *State v. Rickman*, 876 S.W.2d 824, 828 (Tenn. 1994)).  However, election is not required where there is no evidence of multiple sex crimes.[4]  When only one offense is at issue, there is no risk that a jury could base its conviction on a non-unanimous verdict, which is one of the primary reasons for the election requirement.  *See id*.  Moreover, even where an election is required, the State is not required to elect a particular date.  Instead, all that is required is an adequate identification of a particular offense.  *See id.* at 424 (discussing *State v. Shelton*, 851 S.W.2d 134 (Tenn. 1993)).  Indeed, the other primary purpose of the election requirement is "to allow the State some latitude in the prosecution of criminal acts committed against young children who are frequently unable to identify a specific date on which a particular offense was committed."  *Id.* (quoting *Rickman*, 876 S.W.2d at 828).  In this case, evidence of only one incident of sexual battery was presented to the jury.  Because the victim gave conflicting testimony, before trial and at trial, about when the crime occurred, the State was entitled to rely on a specific date range in the indictment and was not required to elect a specific date of the offense.  This issue is without merit.

## C.  Jury Instruction on Sequential Consideration

Defendant argues that the trial court erred by overruling his objection to the jury instructions and instructing the jury that it could not begin deliberating on a lesser included offense until it found him not guilty of the greater offense.  However, our supreme court has specifically approved of jury instructions on sequential consideration of lesser included offenses.  *State v. Davis*, 266 S.W.3d 896, 905 (Tenn. 2008).  This issue is without merit.

---

[3] Although there is not an order amending the indictment in the record, both parties acknowledge that the jury was presented with an amended indictment.  Defendant does not complain about the amendment of the indictment.

[4] Defendant's reliance on *State v. Brown*, 992 S.W.2d 389, 392 (Tenn. 1999), as authority requiring an election of offenses is misplaced because evidence of multiple instances of sexual abuse was presented during the trial in *Brown*.

*D. Jury Instruction on Admissions and Corroboration*

Defendant argues that the trial court erred in denying his request for a special jury instruction on the need for corroboration of Defendant's admissions. The State disagrees.

It is well-recognized that a defendant in a criminal case "has a right to a correct and complete charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." *State v. Garrison*, 40 S.W.3d 426, 432 (Tenn. 2000); *see State v. Leath*, 461 S.W.3d 73, 105 (Tenn. Crim. App. 2013). When reviewing jury instructions on appeal to determine whether they are erroneous, this Court must "review the charge in its entirety and read it as a whole." *State v. Hodges*, 944 S.W.2d 346, 352 (Tenn. 1997). A trial court need not give requested instructions if the substance of the instructions is covered in the general charge. *State v. Zirkle*, 910 S.W.2d 874, 892 (Tenn. Crim. App. 1995) (citing *State v. Blakely*, 677 S.W.2d 12 (Tenn. Crim. App. 1983)). A jury instruction is considered "prejudicially erroneous" only "if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." *Hodges*, 944 S.W.2d at 352.

Prior to trial, Defendant filed a written objection to the trial court's jury instructions. Citing *Helton v. State*, 547 S.W.3d 564 (Tenn. 1977), Defendant requested that the following language be added to Section 42.11 of the Tennessee Pattern Jury Instructions: "Keep in mind that an admission is not sufficient in itself to support a conviction."

Tennessee follows "the long-established common-law rule that a person cannot be convicted of a crime solely on the basis of an uncorroborated extrajudicial confession." *State v. Frausto*, 463 S.W.3d 469, 479-80 (Tenn. 2015). Adequate corroboration must satisfy the modified trustworthiness standard. *State v. Bishop*, 431 S.W.3d 22, 59-60 (Tenn. 2014). Under this standard, an offense involving a tangible injury requires the State to provide "substantial independent evidence tending to show that the defendant's statement is trustworthy, plus independent prima facie evidence that the injury actually occurred." *Id.* at 60. A "sex offense lacking physical evidence but involving a victim who testified" is considered a tangible injury crime. *Frausto*, 463 S.W.3d at 480; *State v. Clark*, 452 S.W.3d 268, 280 (Tenn. 2014). Admissions, like confessions, must also be corroborated. *See Bishop*, 431 S.W.3d at 58-59.

Defendant relies on *United States v. Adams*, 583 F.3d 457, 468-70 (6th Cir. 2009), as support for his argument. In *Adams*, the defendant was charged with being a felon in possession of a firearm in violation of federal law. *Id.* at 460. The defendant was present in a motel room with several other individuals when the registered occupant of the motel room consented to a search by police officers. *Id.* at 461. One of the officers discovered a jacket on the floor near the bed on which the defendant was sitting. *Id.* The jacket

-13-

contained a gun, drugs, and drug paraphernalia. *Id.* The defendant was arrested and initially maintained that the jacket and its contents did not belong to him. *Id.* at 461-62. Several hours later, while being questioned, the defendant eventually admitted that the gun was his and subsequently made a written statement to the same effect. *Id.* at 462.

Prior to the trial, the defendant requested a specific jury instruction that the defendant could not be convicted "solely upon his own uncorroborated statement or admission." *Id.* at 463. The district court denied the request, noting that there was corroborating evidence of the crime. *Id.* On appeal, the circuit court held that the district court erred in refusing to give the requested jury instruction on corroboration and that omission of the jury instruction was not harmless in light of the other evidence in the case. *Id.* at 470. Relying on its precedent in *United States v. Marshall*, 863 F.2d 1285 (6th Cir. 1988), the court rejected the government's argument that no jury instruction was necessary when corroborating evidence existed. *Adams*, 583 F.3d at 469. The court explained, that under *Marshall*, "the instruction is required notwithstanding the existence of additional corroborating evidence." *Id.* In *Marshall*, the court explained:

> The record reveals some evidence which may tend to corroborate defendant's statements that he distributed cocaine, but the jury was never advised that corroboration was necessary. It may have convicted on the basis of the uncorroborated statement alone. The District Court's refusal to give the requested corroboration instruction was erroneous, and we are unable to say it was harmless.

863 F.2d at 1288.

Defendant asserts that older editions of the Tennessee Pattern Jury Instructions ("TPI") included an instruction on corroboration within the broader instruction on confessions and admissions, which is absent from recent editions. In this case, the trial court's jury instruction mirrored Section 42.11 of the TPI, which read as follows:

> Evidence has been introduced in this trial of a statement or statements by the defendant made outside the trial, to show an *admission against interest*. An admission against interest is a statement by the defendant which acknowledges the existence or truth of some fact necessary to be proven to establish the guilt of the defendant or which tends to show guilt of the defendant or is evidence of some material fact, but not amounting to a confession.
>
> While this evidence has been received[,] it remains your duty to decide if in fact such statement was ever made. If you believe a statement was not made by the defendant[,] you should not consider it. If you decide

the statement was made by the defendant, you must judge the truth of the facts stated. In so determining, consider the circumstances under which the statement was made. Also consider whether any of the other evidence before you tends to contradict the statement in whole or in part. You must not, however, arbitrarily disregard any part of any statement, but rather should consider all of any statement you believe was made and is true. You are the sole judge of what weight should be given such statement. If you decide a statement was made, you should consider it with all other evidence in the case in determining the defendant's guilt or innocence.

The State offers a similar argument to that of the federal government in *Marshall*—a trial court is not required to give a special jury instruction on corroboration "where the record was replete with proof of the trustworthiness of the defendant's statement." Alternatively, the State also argues that the given instruction adequately covered the applicable law of corroboration. To support this argument, the State relies on *State v. Jimmy Dale Pickett*, No. M2005-02434-CCA-R3-CD, 2007 WL 471136 (Tenn. Crim. App. Feb. 7, 2007), *perm. app. denied* (Tenn. May 14, 2007). In that case, the defendant was charged with first degree murder and especially aggravated robbery. *Id.* at *1. He requested a special jury instruction on corroboration. *Id.* at *11. The trial court denied the request and instead gave the TPI instruction on corroboration. *Id.* at *12. This Court held that Section 42.12 of the TPI for confessions was an adequate instruction on the law and concluded that the trial court had not erred in denying the defendant's request for a special instruction on corroboration. *Id.*

Based on our analysis in *Jimmy Dale Pickett*, we conclude that Section 42.11 of the TPI, as charged in this case, is an adequate and accurate statement of the law on admissions. Although the language of Section 42.11 for admissions differs slightly from Section 42.12 for confessions, the substance of both instructions is effectively the same. The trial court's jury instruction advised the jury to consider Defendant's admissions along with all other evidence in the case when determining the veracity of the admissions as well as the degree of weight to give the admissions in determining guilt or innocence. As such, we cannot say that the trial court erred in refusing Defendant's request. He is not entitled to relief on this issue.

### E. Sufficiency of the Evidence

Defendant argues that the evidence was insufficient (1) to establish that he acted intentionally for the purpose of sexual arousal or gratification; (2) to establish when the offense occurred; (3) to establish that venue was proper in Anderson County; and (4) to corroborate Defendant's admissions. The State disagrees.

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The jury's verdict replaces the presumption of innocence with one of guilt; therefore, the burden is shifted onto the defendant to show that the evidence introduced at trial was insufficient to support such a verdict. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). The prosecution is entitled to the "strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). It is not the role of this Court to reweigh or reevaluate the evidence, nor to substitute our own inferences for those drawn from the evidence by the trier of fact. *Reid*, 91 S.W.3d at 277. Questions concerning the "credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn.2008)). "A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." *Reid*, 91 S.W.3d at 277 (quoting *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997)). This standard of review applies whether the conviction is based upon direct evidence, circumstantial evidence, or a combination of the two. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009).

### 1. Mens Rea

"Sexual battery is unlawful sexual contact with a victim . . . ." T.C.A. § 39-13-505(a). Sexual contact is defined as "the intentional touching of the victim's . . . intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's . . . intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." T.C.A. § 39-13-501(6). Intimate parts include "vaginal fluid, the primary genital area, groin, [or] inner thigh." T.C.A. § 39-13-501(2). Sexual battery is aggravated if the "victim is less than thirteen (13) years of age." T.C.A. § 39-13-504(a)(4).

In this case, the victim testified that Defendant touched her "private part" in the bathroom for a "long" time, causing a sensation she described as "hurt funny." The victim could not recall whether the touch was inside or outside of her clothing, but she said that Defendant licked his finger after he touched her. Defendant admitted verbally and in writing that he "touched" the victim with his finger after licking it. When asked why he touched the victim, Defendant said he did not know. In his written statement,

Defendant said that he was examining the victim for a urinary tract infection, which her mother admitted that she had on at least one previous occasion.

From this evidence, a rational jury could infer that Defendant's touching of the victim was for "sexual arousal or gratification." The victim's testimony suggested that it lasted long enough for her to feel uncomfortable. It stands to reason that this is why she recognized this contact was a "bad touch" and informed her mother of what had happened. Defendant's statement suggests that he recognized that the contact was not for a legitimate purpose because he said that he only touched her one time and never did it again, attempting to minimize his culpability. When asked by Detective Boucher why he was touching the victim's private part, Defendant did not indicate that the touching was for a legitimate purpose but said he did not know why he touched her. When he made his admission, Ms. Bowers said that the Defendant appeared almost tearful, suggesting he felt that his conduct had been wrong. Contrary to Defendant's arguments on appeal, the jury was entitled to reject his assertion that he touched the victim while checking for signs of a UTI. Most significantly, perhaps, is the victim's testimony that he licked his finger after he touched her, which sparing the reader explicit explanation, can suggest only that he intended the contact for sexual arousal or gratification. The evidence is sufficient to support the jury's finding that he acted intentionally for the purpose of sexual arousal or gratification.

### 2. Date of the Offense

Defendant argues that the evidence was conflicting as to when the offense actually occurred and therefore was insufficient to support his conviction. However, as we discussed earlier, the State was not required to prove the date on which the offense occurred. Neither the date nor the time of the offense is an element of the crime or a requirement of due process. This argument is without merit.

### 3. Venue

Defendant argues that the State "never proved that the venue of this offense was Anderson County." In Tennessee, our constitution requires that venue be located in the county where the crime was committed, and it is considered a component of the trial court's jurisdiction which must be proven by a preponderance of the evidence. *State v. Young*, 196 S.W.3d 85, 101 (Tenn. 2006).

K.B. testified that the offense occurred in the bathroom of the home of Defendant's mother. Ms. Ward testified that the home of Defendant's mother was located within the city limits of Oak Ridge on Royce Circle in Anderson County. We believe that this evidence is enough that the jury could have found by a preponderance of

the evidence that venue was proper in Anderson County. Defendant is not entitled to relief on this basis.

### *4. Corroboration*

Defendant argues that the evidence is insufficient to corroborate Defendant's admissions. Although he contends that this was a crime with no tangible injury, in a foregoing portion of this opinion, we cited cases by our supreme court specifically classifying sex crimes with a testifying victim as crimes with tangible injuries. *See Frausto*, 463 S.W.3d at 480; *Clark*, 452 S.W.3d at 280. Therefore, under the modified trustworthiness standard, the State was required to present "substantial independent evidence tending to show that the defendant's statement is trustworthy, plus independent prima facie evidence that the injury actually occurred." *Bishop*, 431 S.W.3d at 60. "'Prima facie' evidence is evidence that will establish a fact or sustain a judgment unless contradictory evidence is produced." *Clark*, 452 S.W.3d at 280 (internal quotation omitted). "'Substantial evidence' is evidence that a reasonable mind could accept as adequate to support a conclusion; evidence beyond a scintilla." *Id.* (internal quotation omitted). In this case, the victim's testimony that she was touched inappropriately and that she was touched by Defendant was both independent prima facie evidence that a crime occurred and independent substantial evidence of the trustworthiness of Defendant's admission that he was the perpetrator. Accordingly, the evidence is sufficient to support Defendant's conviction, and he is not entitled to relief on this basis.

### *IV. Conclusion*

For the foregoing reasons, the judgment of the trial court is affirmed.

_____
TIMOTHY L. EASTER, JUDGE